# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| LINDSAY DAVIS, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | 7:17-cv-01533-LSC |
| J. MICHAEL WHITE, *et al.*, | ) | |
| Defendants | ) | |

| | | |
|---|---|---|
| NICOLE SLONE, *et al.*, | ) | |
| Plaintiffs, | ) | 7:17-cv-01534-LSC |
| v. | ) | |
| J. MICHAEL WHITE, *et al.*, | ) | |
| Defendants | ) | |

| | | |
|---|---|---|
| MONICA  LAWRENCE, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | 7:17-cv-01535-LSC |
| J. MICHAEL WHITE, *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OF OPINION

Plaintiffs, Lindsay Davis and Benjamin Davis (collectively "Davis Plaintiffs"), Nicole Slone and Jonathan Slone (collectively "Slone Plaintiffs"), and Monica Lawrence and John Lawrence, Jr. (collectively "Lawrence Plaintiffs"), each bring separate actions asserting, among other things, procedural due process claims pursuant to 42 U.S.C. § 1983 against the following defendants: J. Michael White ("White"), Eco-Preservation Services, LLC ("Eco"), Serma Holdings, LLC ("Serma"), Aketa Management Group ("Aketa"), and Knobloch, Inc. ("Knobloch") (collectively "White Defendants"); The Town of Lake View, Alabama ("Lake View"); and Government Utility Services Corporation of Lake View ("the GUSC"). (Doc. 33 in No. 7:17-cv-01533-LSC, Doc. 48 in No. 7:17-cv-01534-LSC, and Doc. 44 in No. 7:17-cv-01535-LSC.)[1] Slone Plaintiffs and Lawrence Plaintiffs further assert several of the same federal and state-law claims against Defendants Michael Walraven ("Walraven") and EOS Utility Services, LLC ("EOS") (collectively "EOS Defendants"). (Doc. 48 in Slone Case and Doc. 44 in Lawrence Case.)

---

[1]     In the interest of space, this Opinion will hereafter cite to the actions brought by Davis Plaintiffs, Slone Plaintiffs, and Lawrence Plaintiffs as "Davis Case," "Slone Case," and "Lawrence Case," respectively. Where possible, the Court will attempt to cite to any relevant document from the earliest filed case in which that document was included as part of the record.

Before the Court are the GUSC's motions for summary judgment (Doc. 113 in Davis Case, Doc. 139 in Slone Case, and Doc. 141 in Lawrence Case), White Defendants' motions for partial summary judgment (Doc. 114 in Davis Case, Doc. 140 in Slone Case, and Doc. 142 in Lawrence Case), Lake View's motions for summary judgment (Doc. 116 in Davis Case, Doc. 141 in Slone Case, and Doc. 143 in Lawrence Case), and EOS Defendants' motions for summary judgment (Doc. 144 in  Slone Case and Doc. 146 in Lawrence Case). For the reasons explained below, Lake View's motions are due to be granted, the GUSC's motions are due to be denied, and the other Defendants' various motions are due to be granted in part and denied in part.

## I.   BACKGROUND[2]

### A. GENERAL FACTS

The Town of Lake View, Alabama was incorporated in 1998. (Doc. 119-9 at 5 in Davis Case.) Within a year, Lakeview began taking steps to create a sewer system

---

[2]    The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .").

that would serve its residents. First, it authorized the incorporation of the GUSC, pursuant to Alabama Code § 11-97-3. (Doc. 33-1 at 5 in Davis Case.)[3] Second, representatives of Lake View approached White about operating the planned sewer system. (Doc. 119-12 at 14–15 in Davis Case.)

White sits at the center of a complicated web of private entities that have come to form the bedrock of Lake View's sewer system. For example, he owns or is at least a member of Serma and Knobloch. (*Id.* at 10.) Serma is a holding company that owns or is a member of Eco. (*Id.* at 29.) Eco owns a wastewater treatment plant that serves subdivisions developed by Serma, by chemically treating wastewater through a pipeline into Mud Creek. (*Id.* at 39.) Eco does business under the name "Tannehill Sewer System." (Doc. 113-12 at 2 in Davis Case.) Knobloch holds the permits necessary for Eco's facility to operate in compliance with federal environmental regulations. (Doc. 119-12 at 39 in Davis Case.) Aketa is an "accounting designation" used by another company, Builder 1. (*Id.* at 75.) Builder 1 is itself owned by Serma. (*Id.* at 33.) Together, White and these private entities (excluding Builder 1) constitute White Defendants.

---

[3]    The GUSC is a government utility services corporation. A government utility services corporation is a public corporation organized under Title 11, Chapter 97 of the Code of Alabama and vested with statutory powers to acquire, construct and operate utility systems. Ala. Code § 11-97-8(a)(5).

Though not as closely tied to White's web of entities, EOS Defendants also participate in the operation of Lake View's sewer system. EOS operates and maintains Eco's sewer treatment plant and collection system. (Doc. 119-11 at 10 in Davis Case.) Walraven serves as EOS's Operations Manager. (*Id.* at 9.)

On June 22, 1999, Lake View adopted an ordinance granting the GUSC and Serma a non-exclusive franchise to use Lake View's public ways and other public places to construct and maintain a wastewater collection system that would be connected to Eco's wastewater treatment plant. (Doc. 33-5 at 2–7 in Davis Case.) On July 13, 1999, Lake View and the GUSC entered into an agreement wherein Lake View transferred its planned sanitary sewer system to the GUSC. (Doc. 119-12 at 128 in Davis Case.) That same day, the GUSC and Serma entered into an agreement in which the GUSC agreed to sell and let its rights in the sewer system to Serma, which agreed to "purchase and lease them." (*Id.* at 146.) Under the 1999 purchase agreement between Lake View and the GUSC, the GUSC promised to "use all its best efforts to collect from its customers all accounts past due" for the sewer system. (Doc. 119-12 at 140 in Davis Case.) The agreement further declared that once the GUSC "has exhausted all lawful means available . . . to collect any accounts due" to the GUSC, those accounts would become the property of Lake View. (*Id.*) Lake View then certified that, once it collected those past due accounts, it would "pay over to

the [GUSC] a sum equal to [90%] of the past due accounts within [30] days from such time as such accounts shall be collected." (*Id.* at 140–41.) The agreement between the GUSC and Serma created a substantially similar obligation for the GUSC to "use its best efforts and whatever means allowed by law" to collect any fees deemed uncollectable by Serma and then to reimburse Serma for 90% of the same. (*See* doc. 119-13 at 7 in Davis Case.)

Over time, the GUSC has become significantly indebted to White Defendants. The GUSC does not collect sewer service revenues and therefore does not generate its own income. (Doc. 113-9 at 20 in Davis Case.) The GUSC's only creditors are Serma or White. (*Id.* at 20–21.) As of December 30, 2015, the GUSC was in debt to Serma for $2,303,843.02. (Doc. 123-27 at 10 in Davis Case.) To avoid defaulting on its loans from White Defendants, the GUSC has entered into various forbearance agreements with Serma wherein the GUSC has agreed to take on certain obligations. For example, the GUSC board unanimously adopted the Second Forbearance Agreement on October 24, 2012. (Doc. 123-23 at 4.) Pursuant to that agreement, the GUSC promised to authorize its chairman to execute a "Deed in Lieu of foreclosure" in favor of Serma that would transfer all of the GUSC's assets to Serma. (Doc. 113-11 at 9 in Davis Case.) The GUSC also promised to obtain a resolution from Lake View "to designate such individuals, subject to the approval of Lender, to

serve as members of [the GUSC's] Board of Directors for those positions that may expire within Ninety (90) days from the date of this Agreement." (*Id.*) Notably, the GUSC lacks the authority to do anything more than "ask" that Lake View adopt such a resolution. (Doc. 113-9 at 66 in Davis Case.)

The GUSC's debt situation continued to deteriorate, and on December 30, 2015, the GUSC board unanimously adopted the Fourth Forbearance Agreement between itself and Serma. (Doc. 123-27 at 4 in Davis Case.) Under the agreement, the GUSC promised to adopt a resolution acknowledging that Serma had the "sole and exclusive authority to establish Wastewater Standards, Rules, Regulations, Policies and Procedures for the operation of the sanitary sewer system, as set forth in the Utility Service Agreements" ("Wastewater Standards") with users. (*Id.* at 12.)  The agreement made no mention of the GUSC's adoption of such standards. (*See id.*) However, at the same meeting on December 30, 2015, the GUSC also unanimously approved a resolution adopting White Defendants' Wastewater Standards "as they exist, and as they may be changed or amended from time to time by the Utility Service Provider." (*Id.* at 5, 17.) At that time, and through the present, Nancy Ray has served as the chairman of the GUSC's board. (Doc. 113-9 at 14 in Davis Case.)

The operative Wastewater Standards authored by White Defendants and unanimously adopted by the GUSC board became effective on February 1, 2016. (Doc. 113-12 at 2 in Davis Case.) Under these standards, Eco, the service provider, "may terminate sanitary sewer service and/or disconnect a User from the Tannehill Sewer System, and/or cut-off the supply of water to the User when . . . [t]he User has . . . failed to pay monthly billing charges when due [or] failed to pay any fee, surcharge, penalty or assessment when due." (*Id.* at 82.) The Wastewater Standards create a right of entry onto a user's property for Eco's agents, "upon presentation of his/her credentials to any User . . . within thirty (30) minutes of such presentation," for the purpose of suspending services. (*Id.* at 84.) The Wastewater Standards also provide that an "unauthorized discharge of waste, wastewater or storm drainage" into the sewer system will result in a penalty of $5,000 per day. (*Id.* at 99.) They further state that tampering with "a lockout device placed on a water cut-off valve" will result in a penalty as established in the "Sewer Rate Schedule," as well as criminal prosecution under § 13A-8-10 and/or § 13A-8-23 of the Code of Alabama. (*Id.* at 100.) In general, the Wastewater Standards create a host of potential

fees and penalties, and they do not appear to provide any opportunity for users to challenge said fees or penalties.[4]

On May 31, 2017, White sent an email with the subject heading "Past Due Sewer Accounts – Lake View Reimbursement" to both Nancy Ray, GUSC chairman and councilwoman for Lake View, and Lake View Mayor Paul Calhoun. (Doc. 123-43 at 2 in Davis Case.) In the email, White noted the obligations of Lake View and the GUSC to reimburse White Defendants for any uncollectable past due amounts from Tannehill Sewer System users. (*Id.*) He attached a list of past due amounts, which included the property of Slone Plaintiffs, and implied that he would be demanding reimbursement from Lake View and the GUSC. (*See id.*) Nancy Ray emailed a response that same day, noting that she "[t]hought [White was] going to start shutting off service" and referencing Mayor Calhoun's intent to write a letter "stating that Lake View police would respond" if White's employees encountered resistance. (Doc. 123-44 in Davis Case.) White replied that he had received no such letter and that "after the last experience our engineers will not put lockouts or install water cut-offs without a police escort." (*Id.*)

---

[4]     Notably, at least one public official engaged in the regulation of utility systems has commented that the fees and penalties in place for the Tannehill Sewer System are "exceptionally high—much higher than the wastewater companies we regulate." (Doc. 123-2 at 3 in Davis Case.)

On June 7, 2017, in response to White's demands, Nancy Ray sent White an email that included a letter written by Mayor Calhoun and addressed to White. (Doc. 123-45 in Davis Case.) In the letter, Mayor Calhoun stated that he had "been notified" of White's wish to have Lake View police available to protect his workers "when they begin shutting off service to sewer customers that have delinquent accounts." (*Id.*) He continued by stating that Lake View would "not tolerate harassment nor harm inflicted on any of [White's] crews attempting to carry out the lawful functions of their jobs" and told White to instruct his crews to "call 911 from a point of safety" if they encountered any such issues. (*Id.*) White forwarded this email to Walraven on June 8, 2017. (*Id.*)

## B. FACTS SPECIFIC TO DAVIS PLAINTIFFS

Serma developed the Woodland Park Garden Homes Subdivision in the early 2000s. (Doc. 119-12 at 15 in Davis Case.) In March 2003, Serma, as subdivision developer, unilaterally executed a *Declaration of Protective Covenants and Conveyance Restrictions for Woodland Park Garden Homes Subdivision*, applicable to Lots 1 through 33 of the subdivision, and had it recorded in the probate records of Tuscaloosa County in Deed Book 2003 at page 5408 through 5443. (Doc. 33-4 in Davis Case.) Article XI of the Declaration, entitled "Utility Service Fee Assessment and Lien" indicates that the covered properties will receive sewer services from Eco,

will be subject to Eco's rules and regulations, and will be subject to assessments made by Eco. (*Id.* at 22.) It further states that each assessment will run with the land, that "[a]ny assessments not paid on or before the due date . . . .shall bear interest" of up to eighteen (18%) percent per year, and that Eco shall have the right to file a lien against a property if an owner does not make accounts current within ten days of a written demand. (*Id.* at 22–23.) It further incorporates a Utility Services Agreement ("USA") executed by Eco and Serma on March 28, 2003 and recorded as an exhibit to the Declaration. (*Id.* at 30–37.) Under Section 2.6 of the USA, in the event of default and after ten days' written notice of such default, Eco may suspend a user's services and may enter the user's property for that purpose. (*Id.* at 31.)

On March 30, 2017, Davis Plaintiffs purchased and took possession of a single-family house located at 12957 Woodland Park Circle, McCalla, Alabama 35111. (Doc. 33 at ¶ 17 in Davis Case.)[5] This address was described in their deed as Lot 6, Woodland Park Garden Homes. (Doc. 113-16 at 47 in Davis Case.) As of July 17, 2017, Davis Plaintiffs had not made any sewer payments for their newly purchased property. (*Id.* at 57.) Nor had they sought to establish sewer service for the property in their names. (*Id.* at 29.)

---

[5]     Plaintiffs rely on their amended complaints for several of their proposed undisputed facts. (Docs. 33 in Davis Case, 48 in Slone Case, and 44 in Lawrence Case.) Defendants do not appear to object to the use of Plaintiffs' amended complaints as evidence. Accordingly, where necessary, the Court will glean certain facts from the amended complaints.

On July 17, 2017, White sent an email to Walraven, asking him to "lockout the properties on the attached list." (Doc. 123-47 in Davis Case.) Davis Plaintiffs' address appeared on the attached list. (*Id.*) On July 18, 2017, Walraven sent White an email that included an attached report confirming that Walraven had installed a lock on the Davis property's valve. (*See* doc. 123-48 in Davis Case.)

On July 31, 2017, Davis Plaintiffs temporarily moved their family into the Woodland Park property for the first time. (Doc. 113-16 at 31 in Davis Case.) Plaintiff Lindsay Davis ("Mrs. Davis") contacted Eco for the first time, intending to establish sewer service for the property in Davis Plaintiffs' names. (*Id.* at 7.) During this time, a representative for Eco informed Mrs. Davis that a lock had been placed on her property's water valve. (*Id.* at 8.) Mrs. Davis informed her that the property had running water, and the representative responded that she would investigate. (*Id.*) In a subsequent conversation, the representative informed Mrs. Davis that a technician had confirmed that the lock placed on their property had been tampered with. (*Id.*) The representative further informed Mrs. Davis that Davis Plaintiffs would owe a related fee of $5,000 and that Eco would lock the property out of water service again the following day. (*Id.* at 8–9.) On August 1, 2017, Mrs. Davis sent a letter to Eco via email, formally challenging the tampering penalty and describing her conversations with Eco's representative. (Doc. 33-3 at 4–5 in Davis Case.) Plaintiff Benjamin Davis

("Mr. Davis") sent a cashier's check for $1,075 to the Tannehill Sewer Fund. (*Id.* at 7.) Davis Plaintiffs intended for this check to make them current on their unpaid sewer account, excluding the additional tampering fee. (Doc. 113-16 at 9 in Davis Case.) Eco later returned the check. (*Id.*)

On August 5, 2017, Davis Plaintiffs received a letter from Eco regarding their sewer fees. (*Id.*) Attached with the letter was an assessment statement indicating that Davis Plaintiffs owed a balance of $6,669.08 for unpaid sewer bills, late fees, and the tampering penalty, among other charges. (Doc. 33-3 at 11 in Davis Case.) The letter noted that these assessments arose out of the applicable Wastewater Standards. (*Id.* at 9.) It further declared that a police report regarding the alleged tampering would be filed with the Lake View Police Department and that Davis Plaintiffs may be arrested and face "criminal prosecution under Code of Alabama §13A-8-10 and §13A-8-23." (*Id.*) It ordered Davis Plaintiffs to make their account current within ten days, lest Eco terminate their property's sewer connection and file a lien on the property. (*Id.*) Finally, the letter noted that Eco would not accept partial payments. (*Id.*)

Despite Eco's threat of further shut-offs, Davis Plaintiffs have not experienced a subsequent disruption of their access to water or sewer service. (Doc. 113-16 at 9.) Davis Plaintiffs have attempted to pay their monthly sewer fees. (*Id.* at

30.) However, Eco continues to deny their partial payments, and the unpaid fees and accompanying interest continue to accrue. (*Id.*) No police report was ever filed against Davis Plaintiffs for the tampering incident. (Doc. 119-1 at 28 in Davis Case.)

On May 31, 2019, White filed a lien on behalf of Eco against Davis Plaintiffs' property in the records of the Tuscaloosa County Probate Court in the amount of $53,923.08. (Doc. 123-57 in Davis Case.) As of March 13, 2020, Davis Plaintiffs have an outstanding sewer account balance of $88,320.80. (Doc. 123-58 in Davis Case.)

## C. FACTS SPECIFIC TO SLONE PLAINTIFFS

In 2012, Eco entered into a USA with Logan Real Estate Holdings, LLC ("Logan"), to provide sewer services to portions of the Logan-developed subdivision Downing Park at Tannehill Preserve. (Doc. 119-5 at 55 in Davis Case.) The USA was recorded in the probate records of Tuscaloosa County in April 2012. (*Id.*) Compared with the USA recorded on Davis Plaintiffs' property, this USA includes substantially the same terms and restrictions regarding the assessment of fees, the user's obligation to comply with the Wastewater Standards propounded by Eco, a right of entry onto a user's property to cut off service in the event of default and ten days' written notice, and the filing of a lien following written demand to make accounts current. (*See id.* at 55–57.)

On October 31, 2014, Slone Plaintiffs purchased, mortgaged, and took possession of a single-family house located at 23040 McGehee Drive, McCalla, Alabama 35111. (Doc. 48 at ¶ 17 in Slone Case.) This address is one of the lots of the Downing Park at Tannehill Preserve Subdivision. (Doc. 119-2 at 7 in Davis Case.) In November 2014, Slone Plaintiffs established the property's sewer account with Eco in the name of Plaintiff Jonathan Slone ("Mr. Slone"). (*Id.* at 27.) As of January 2016, the property's sewer account with Eco had an outstanding balance of $729.50. (Doc. 119-3 at 30 in Davis Case.)

In January 2016, Mr. Slone lost his job in Alabama, but obtained another one by July of that same year. (Doc. 119-5 at 8–9 in Davis Case.) In February or March 2016, Slone Plaintiffs temporarily moved in with their parents in Kentucky. (*Id.* at 18.)

Prior to departing for Kentucky, likely near the beginning of February, Mrs. Slone called Eco about the possibility of suspending Slone Plaintiffs' sewer services during their time out-of-state. (Doc. 119-2 at 12.) She spoke with a representative named "Ms. Snow," but does not recall Ms. Snow's full name. (*Id.*) She asked Ms. Snow about suspending their sewer service temporarily. (*Id.*) She informed Ms. Snow that Mr. Slone "had lost his job and that [Slone Plaintiffs] weren't going to be able to pay the [sewer] bill and [they weren't] going to be in Alabama." (*Id.*)

According to Mrs. Slone's testimony, Ms. Snow responded "that it was fine, she didn't see [sic] no problem with it." (*Id.*) Mrs. Slone further testified that, during the time they were in Kentucky, Slone Plaintiffs could not afford to pay their sewer bills. (*Id.*) Both Slone Plaintiffs also admit that they would have moved to Kentucky regardless of Ms. Snow's statement. (Doc. 119-2 at 14 in Davis Case; Doc. 119-5 at 19 in Davis Case.)

When Slone Plaintiffs returned to Alabama, they discovered several sewer bills in their mail that had accumulated while they were in Kentucky. (Doc. 119-2 at 15.) Mrs. Slone contacted Eco to inquire about the sewer bills and again spoke with Ms. Snow. (*Id.*) Ms. Snow informed Mrs. Slone that Eco has an "Always-On" policy regarding sewer services and that Eco charged Slone Plaintiffs even though they were not using the sewer services. (*Id.*)

On September 2, 2016, White filed a lien on behalf of Eco against Slone Plaintiffs' property in the records of the Tuscaloosa County Probate Court in the amount of $2,500.59. (Doc. 123-59 in Davis Case.) As of January 1, 2017, the sewer account for Slone Plaintiffs' property had an outstanding balance of $2,358.70. (Doc. 119-3 at 31 in Davis Case.) Slone Plaintiffs attempted to make payments on the balance. (Doc. 119-4 at 11 in Davis Case.) However, in January 2017, Eco informed them that it would no longer accept partial payments, and it began returning their

checks. (*Id.* at 11–12.) Between March and May 2017, Slone Plaintiffs received three separate letters from Eco, informing them that their sewer/water service was "scheduled for Disconnection" due to their outstanding sewer account balance and asking them to give the matter their immediate attention. (Doc. 119-3 at 32 in Davis Case; Doc. 119-4 at 45, 47 in Davis Case.)

On July 24, 2017, White sent an email to Walraven, directing him to lock-out services on the properties included in an attached list. (Doc. 123-52 in Davis Case.) The list included the Slone property. (*Id.*) Walraven testified that he placed the lock on Slone Plaintiffs' property the same day. (Doc. 119-11 at 15 in Davis Case.) Shortly after Walraven placed the lock, Slone Plaintiffs discovered their lack of running water. (Doc. 119-2 at 18 in Davis Case.) Mrs. Slone called the water company and found that a lock had been placed on the property's shut-off valve. (*Id.* at 19.)

On July 25, 2017, Mrs. Slone sent two emails to Eco, asking why their partial payments had not been applied to their outstanding balance. (*Id.* at 38.) On the same day, Walraven returned to Slone Plaintiffs' property, spoke with Mrs. Slone, and discovered that the lock he had placed on the shut-off valve had been removed. (Doc. 123-54 in Davis Case.) He also noticed that someone had placed a third-party lock on the same valve. (Doc. 119-11 at 25 in Davis Case.) He informed White, (doc. 123-54 in Davis Case), and then filed a criminal complaint on behalf of Eco, (doc. 119-11

at 12–13.) The exact nature of this criminal complaint appears to be in dispute, but it is undisputed that no warrant was ever issued for any of the Slone Plaintiffs' arrest. (Doc. 119-2 at 20 in Davis Case.)

On July 26, 2017, Eco sent a collection letter to Slone Plaintiffs that was substantially identical to the letter that Davis Plaintiffs received on August 5, 2017. (*See* Doc. 48-3 at 11 in Slone Case.) Included with the letter was an assessment statement indicating that Slone Plaintiffs owed $9,906.85 in sewer fees and penalties. (*Id.* at 13.) Notably, although the Eco's July 26 letter threatened to terminate Slone Plaintiffs' services if they did not make their account current, Slone Plaintiffs have not experienced any other interruptions in service. (Doc. 119-5 at 24 in Davis Case.)

Slone Plaintiffs have continued to make monthly payments, but they have not attempted to pay the full outstanding charges on their account. (Doc. 119-4 at 23–24.) Eco continues to refuse the partial payments. (Doc. 119-2 at 30 in Davis Case.) In May 2019, White filed a lien on behalf of Eco against Slone Plaintiffs' property in the records of the Tuscaloosa County Probate Court in the amount of $79,826.93. (Doc. 119-13 at 23–24 in Davis Case.) As of March 13, 2020, Slone Plaintiffs have an outstanding sewer account balance of $69,781.08. (Doc. 123-60 in Davis Case.)

### D. FACTS SPECIFIC TO LAWRENCE PLAINTIFFS

In 2012, Eco entered into another USA with Logan to provide sanitary sewer service to portions of the Logan-developed subdivision Olmstead Place at Tannehill Preserve, including "Lots 2-92 through 2-105." (Doc. 44-3 in Lawrence Case.) That USA was recorded in the probate records of Tuscaloosa County in April 2012. (*Id.*) This USA is substantially identical to the USA pertaining to Slone Plaintiffs' property. (*See id.*) On August 17, 2012, Lawrence Plaintiffs purchased, mortgaged, and took possession of a single-family house located at 22806 Rimbred Court, McCalla, Alabama 35111. (Doc. 44 at ¶ 21 in Lawrence Case.) This property lies on Lot 2-101 of the Olmstead Place at Tannehill Preserve Subdivision. (Doc. 44-1 at 13 in Lawrence Case.)

Lawrence Plaintiffs failed to pay several sewer bills on time, and by July 1, 2017, Lawrence Plaintiffs had an outstanding sewer account balance of $327.00. (Doc. 119-6 at 120 in Davis Case.) On July 17, 2017, White sent an email to Walraven, directing him to terminate service at a list of properties attached to the email. (Doc. 123-47 in Davis Case.) Lawrence Plaintiffs' property appeared on the attached list. (*Id.* at 3.) On July 18, 2017, Walraven sent White an email confirming that he had installed a lock on the valve located on the Lawrence property. (*See* doc. 123-48 in Davis Case.)

On July 18, 2017, Monica Lawrence ("Mrs. Lawrence") returned home to discover that her house lacked running water. (Doc. 119-6 at 23 in Davis Case.) That same night, she sent an email to EOS to request immediate assistance with her water. (*Id.* at 121.) Walraven replied to her email, telling her she would have to speak with Eco. (*Id.*) Unable to reach anyone who could provide immediate assistance, Mrs. Lawrence went outside with tools and cut off the portion of the shut-off valve on which the lock had been installed. (*See id.* at 24–26.)

On July 19, 2017, Mrs. Lawrence spoke with an Eco representative named Ms. Snow. (*Id.* at 12.) Ms. Snow indicated that, in order to make their account current, Lawrence Plaintiffs would need to make a payment of $778 by cashier's check submitted at EOS's office. (*Id.*) That same day, Mrs. Lawrence did just that. (*Id.*)

Because Lawrence Plaintiffs had made their account current, on July 19, 2017, White directed Walraven to remove the lock from the water shut-off valve on their property. (*See* doc. 123-50 in Davis Case.) However, when Walraven returned to the Lawrence property, he discovered that Lawrence Plaintiffs had removed the lock and restored the water themselves. (Doc. 123-51 in Davis Case.) On July 24, 2017, Walraven made a criminal complaint with the Lake View Police Department regarding the removal of the lock. (Doc. 119-11 at 15–16 in Davis Case.) The details of this complaint appear to be in dispute. Regardless, Lawrence Plaintiffs have never

been arrested or prosecuted for tampering with the lock. (Doc. 119-8 at 18 in Davis Case.)

Eco mailed Lawrence Plaintiffs a collection letter that is substantially identical to the letter received by Davis Plaintiffs on August 5, 2017. (Doc. 44-2 at 4 in Lawrence Case.) Included in the letter was an assessment statement indicating that Lawrence Plaintiffs' sewer account had an outstanding balance of $5,442.00. (*Id.* at 7.) Mrs. Lawrence subsequently spoke with Ms. Snow to dispute the added penalty for tampering with the lock, but she did not receive a clear answer. (Doc. 119-6 at 13, 124 in Davis Case.) Regardless, Lawrence Plaintiffs have not experienced another suspension of their water/sewer services. (*Id.* at 27.)

On May 31, 2019, White filed a lien on behalf of Eco against Lawrence Plaintiffs' property in the records of the Tuscaloosa County Probate Court in the amount of $79,826.93. (Doc. 123-61 in Davis Case.) As of March 13, 2020, Lawrence Plaintiffs have an outstanding sewer account balance of $119,287.13. (Doc. 123-62 at 2 in Davis Case.)

## II.   STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if "the record taken as a

whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but should determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358

F.3d 859, 860 (11th Cir. 2004)).  In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III.   DISCUSSION

### A. § 1983 CLAIMS

Plaintiffs have brought two separate claims pursuant to § 1983. In Count One, they allege that all named Defendants deprived them of their liberty and property interests without due process of law. In Count Two, they allege that Lake View, the GUSC, and White Defendants have conspired with one another to cause such a deprivation. The Court will discuss each Count in turn.

### 1.   COUNT ONE – § 1983 VIOLATION

"To state a claim for relief in an action brought under § 1983, [Plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state

law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). "[A] § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Am. Fed. of Labor and Cong. of Indus. Orgs. v. City of Miami, Fla.*, 637 F.3d 1178, 1186 (11th Cir. 2011) (quoting *Arrington v. Helms*, 438 F.3d 1336, 1347 (11th Cir. 2006)). Defendants, to varying degrees, have challenged the sufficiency of Plaintiffs' evidence on each of these elements.

### a. STATE ACTION

"To obtain relief under § 1983, [a plaintiff] must show that [she] was deprived of a federal right by a person acting under color of state law." *Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000). In these cases, Plaintiffs allege that private individuals, acting in concert with local government entities, deprived them of their constitutional rights. "Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992).

To determine whether a private actor's conduct qualifies as state action, the Eleventh Circuit has adopted three primary tests: (1) the public function test; (2) the state compulsion test; and (3) the nexus/joint action test. *Willis v. Univ. Health*

*Servs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993). "The public function test . . . covers only private actors performing functions 'traditionally the exclusive prerogative of the State.'" *Nat'l Broad. Co., Inc. v. Commc'ns Workers of Am., AFL-CIO*, 860 F.2d 1022, 1026 (11th Cir. 1988) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974)). Under the state compulsion test, state action occurs where "the government has coerced or at least significantly encouraged the action alleged to violate the Constitution." *Id.* The nexus/joint action test applies where "the State has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Id.* at 1026–27 (quoting *Jackson*, 419 U.S. at 357–58). In their briefing, Plaintiffs rely exclusively upon the nexus/joint action test for state action.

For state action to occur under the nexus/joint action test, "the governmental body and private party must be intertwined in a 'symbiotic relationship.'" *Id.* at 1027 (quoting *Jackson*, 419 U.S. at 357–58). "Attribution is not fair when bottomed solely on a generalized relation with the state." *Id.* at 1025 n.4 (quoting *Frazier v. Bd. of Trs of Nw. Miss.*, 765 F.2d 1278, 1286, *modified on other grounds*, 777 F.2d 329 (5th Cir. 1985)). Therefore, courts have established several limiting principles on what sort of interaction is sufficient to create such a symbiotic relationship. For example, "[m]ere approval of or acquiescence in the initiatives of a private party is not

sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Blum v. Yaretsky*, 457 U.S. 991, 1004–05 (1982). Nor is the mere fact that a private actor contracts with the government to perform a public function. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 840–41 (1982). Moreover, regulation of the private actor by a government entity, even if "extensive and detailed," is not sufficient by itself to convert private action into state action. *Jackson*, 419 U.S. at 350. Finally, and most importantly, "the symbiotic relationship between the public and private entities must involve the alleged constitutional violation." *Patrick*, 201 F.3d at 1316.

The Eleventh Circuit has typically rejected each nexus/joint action argument it has heard. *See, e.g.*, *Patrick*, 201 F.3d at 1313. In *Patrick*, the Hospital Authority of Floyd County ("HAFC"), a public hospital authority, contracted with a private entity, Floyd Healthcare Management, Inc. ("FHM"), to manage and operate the HAFC's hospital. *Id.* at 1314. The parties' agreement gave FHM control over the day-to-day operations of the hospital, including the power to hire and fire employees. *Id.* FHM also had the power to extend membership and clinical privileges at the hospital. *Id.* HAFC maintained control over the hospital's accounts receivable and used those funds to pay public bonds. *Id.* The plaintiff brought a § 1983 claim against HAFC and FHM after FHM's board of directors denied him staff membership and

surgical privileges at the hospital. *Id.* He argued that FHM's actions were attributable to HAFC under the nexus/joint action test. *Id.* at 1315. To show that a symbiotic relationship existed between HAFC and FHM, he noted that HAFC received financial benefit from FHM's operation of the hospital. *Id.* at 1315–16. The Eleventh Circuit rejected this argument for two reasons. First, it noted that "[t]here is no evidence . . . that HAFC had anything to do with FHM's decision to deny [the plaintiff's] application; rather, the Agreement gave sole authority regarding such decisions to FHM." *Id.* at 1316. Second, the court also noted that, though HAFC received financial benefits from FHM's general operation of the hospital, "[t]here is no evidence that HAFC received any benefit *from FHM's decision to deny [the plaintiff's] application.*" *Id.* (emphasis added). The court therefore held that the plaintiff had not established that FHM's actions constituted state action, and it affirmed summary judgment for the defendants. *Id.* at 1317. This outcome is common among the Eleventh Circuit's cases discussing the nexus/joint action test.[6]

---

[6]     *See also Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347–49 (11th Cir. 2001) (holding that the State of Georgia was not a joint participant in alleged child abuse by foster parents, despite the State's regulation of foster parents and extension of governmental tort liability and immunity rules to foster parents); *Nat'l Broadcasting Co., Inc.*, 860 F.2d at 1026–28 (holding that denial of access to a news agency by a lessee of a public convention center did not constitute state action where the public lessor did not encourage or require the exclusion and did not receive any direct benefit from such exclusion).

Indeed, the Court is aware of only one case wherein the Eleventh Circuit has held the nexus/joint action test to be satisfied. *See Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263 (11th Cir. 2003). In *Focus on the Family*, the Pinellas Suncoast Transit Authority ("PSTA"), a government entity responsible for public transportation, entered into an advertising contract with Eller, a private company. *Id.* at 1268. The contract included rules regarding permissible types of advertisements. *Id.* at 1268–69. Moreover, although Eller had the initial authority to approve any proposed advertising, PSTA retained the right to review and remove all advertising that did not meet its approval. *Id.* at 1268. When an evangelical organization's proposed advertising was rejected, the organization brought a § 1983 claim against PSTA for violating its First Amendment rights. *Id.* at 1269–70. It introduced evidence indicating that PSTA, either through its final approval authority or its contractual criteria for approval of advertisements, had caused the rejection of the organization's proposed advertisements. *Id.* at 1278.  A district court granted summary judgment for PSTA, finding that the evangelical organization had failed to show that its injury resulted from state action. *Id.* at 1271. On appeal, the Eleventh Circuit reversed. The court noted that, under the contract between PSTA and Eller, "PSTA established explicit rules for determining the acceptability of an advertisement . . . and retain[ed] final decision-making authority over the

acceptability of all proposed advertisements." *Id.* at 1278. Based on these contractual provisions and the evidence linking PSTA to the decision to reject the advertisements, the Eleventh Circuit ruled that "where the state contractually requires the private actor to take particular actions . . . then it can be said at the summary judgment stage that in acting in accordance with the governmental directive the private actor is merely a surrogate for the state, and the tie between them is sufficiently strong for the nexus/joint action test to be satisfied." *Id.* at 1278–79.

Relying on *Focus on the Family*, Defendants argue that the facts of these cases fall short of those that the Eleventh Circuit has deemed sufficient to satisfy the nexus/joint action test. For example, the facts indicate that the private defendants in this case enjoyed relative autonomy in how they operated the sewer system in Lake View. There is no evidence to suggest that either the GUSC or Lake View took part in drafting the Wastewater Standards or that they required White Defendants to include the challenged provisions. Rather, through the Fourth Forbearance Agreement, the GUSC conceded that White Defendants had the exclusive authority to draft the Wastewater Standards without the GUSC's involvement. Furthermore, many of the facts on which Plaintiffs rely to demonstrate a symbiotic relationship among Defendants—the debts owed by the GUSC or the web of contracts

connecting the private and public defendants in the operation of the Lake View sewer system—do not directly involve the deprivations that Plaintiffs allege. Given these facts, Defendants argue that these deprivations resulted from purely private conduct.

For three intertwined reasons, however, the Court is satisfied that Plaintiffs have shown a sufficient relationship between the public and private defendants. First, at a meeting on December 30, 2015, the GUSB board of directors unanimously adopted the Wastewater Standards on which the private defendants relied in allegedly depriving Plaintiffs of their rights. Second, the facts indicate that the public defendants stood to benefit directly from the private defendants' collection of sewer fees from Plaintiffs. Finally, the chairman of the GUSC board forwarded a letter written by Lake View's mayor promising police assistance if White Defendants encountered resistance in cutting off services to delinquent users.

To begin, the GUSC board of directors unanimously adopted the Wastewater Standards established by White Defendants "as they exist, and as they may be changed or amended from time to time" by White Defendants. (Doc. 123-27 in Davis Case.) Notably, although the Fourth Forbearance Agreement between the GUSC and Serma required the GUSC to adopt a resolution acknowledging Serma's exclusive authority to establish the Wastewater Standards, the agreement did not

expressly require the GUSC to *adopt* those same Wastewater Standards as its own. Thus, the board's unanimous action arguably qualifies as an endorsement of the policies which White Defendants then used to deprive Plaintiffs of their rights. The Court stresses that this fact, standing on its own, would not be sufficient to establish state action in these cases. *See Blum*, 457 U.S. at 1004–05 (indicating that "[m]ere approval of or acquiescence" in a private party's decisions, without more, is not sufficient to establish state action). However, the Court presumes that the GUSC board, including board chairman Nancy Ray, were at least aware of the policies which they unanimously adopted as their own on December 30, 2015.

Next, the record indicates that the GUSC and Lake View each stood to benefit directly from the private defendants' collection of sewer fees. Under the 1999 purchase agreements between Serma, the GUSC, and Lake View, the GUSC agreed to reimburse Serma for 90% of past due accounts if such accounts became uncollectable by Serma and were later collected by the GUSC, and Lake View agreed to reimburse the GUSC for the same if the past due accounts became uncollectable by the GUSC and were later collected by Lake View. (Docs. 119-12, 119-13 in Davis Case.) The record even indicates that White alluded to these contingent obligations when he sought police escorts for service cut-offs in 2017. (Doc. 123-43 in Davis Case.) The GUSC argues that it did not stand to benefit from the collection of

Plaintiffs' sewer bills because "the Town [of Lake View] had ultimate liability for unpaid sewer bills." (Doc. 128 at 7 in Davis Case.) However, under the agreement between Lake View and the GUSC, the GUSC's obligations would only pass to Lake View after the GUSC had "exhausted all lawful means available" to it to collect the past due accounts. (Doc. 119-12 at 140 in Davis Case.)  Thus, both the GUSC and Lake View stood to benefit if White Defendants successfully collected Plaintiffs' unpaid sewer bills. That fact alone distinguishes these cases from *Patrick*, where the Eleventh Circuit rejected a nexus/joint action argument in part because there was no evidence of a direct benefit to the government entity from the violation itself. 201 F.3d at 1316.

Finally, on June 1, 2017, Nancy Ray, chairman of the GUSC board, forwarded a letter written by Mayor Calhoun to White, providing assurances of police protection if White's agents encountered resistance while installing water cut-offs on the properties of delinquent users, such as Plaintiffs. Prior to Ray's forwarding of the letter, White had already indicated that he would demand reimbursement from the GUSC and Lake View for uncollectable past due amounts. In a separate email, he announced his "engineers [would] not put lockouts or install water cut-offs without a police escort." (Doc. 123-44 in Davis Case.) In response, Ray forwarded Mayor Calhoun's letter, addressed to White, providing reassurances of police

protection and instructing White to call the police from a safe distance if his agents encountered resistance. Having received this letter, White then instructed his agents to begin installing locks or cut-offs, commencing the chain of collection practices that Plaintiffs allege deprived them of their rights.

Viewing these facts together in the light most favorable to Plaintiffs as the non-moving parties, Plaintiffs have succeeded in showing a symbiotic relationship between the private and public defendants that involved the constitutional violations in question. Each stood to benefit from the private defendants' successful collection of Plaintiffs' sewer fees. Moreover, through the GUSC board's endorsement of the Wastewater Standards and Nancy Ray's forwarding of Mayor Calhoun's letter to White, the public defendants participated, at least partly, in the decisions to deprive Plaintiffs of their rights. Ray, as chairman of the board that unanimously adopted the Wastewater Standards on December 30, 2015, was in a position to know what policies White would follow in collecting the unpaid sewer fees from users such as Plaintiffs. Despite this knowledge, and in response to White's suggestion that he would not continue with collection practices until he had assurances of police protection, she forwarded Mayor Calhoun's letter and thereby provided such assurances to White. Thus, the public defendants effectively encouraged the private defendants to pursue the harmful practices from which they would receive a direct

benefit. The Court finds that these facts are sufficient to show that the public defendants "so far insinuated [themselves] into a position of interdependence with the [private parties] that [they were] joint participant[s] in the enterprise." *Nat'l Broad. Co., Inc.*, 860 F.2d at 1026–27 (quoting *Jackson*, 419 U.S. at 357–58).

Furthermore, although Plaintiffs do not expressly make any argument under the public function test, the Court finds that there is some evidence supporting such a theory in these cases. The public function test requires a private actor to have exercised "powers traditionally exclusively reserved to the State." *Jackson*, 419 U.S. at 352. That a government entity "exercised the function in the past, or still does" is not sufficient. *Manhattan Comm. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). "[T]he government must have traditionally *and* exclusively performed the function." *Id.* The Supreme Court has held that only a few functions, such as running an election, *Terry v. Adams*, 345 U.S 461, 468–70 (1953), or operating a "company town," *Marsh v. Alabama*, 326 U.S. 501, 505–09 (1946), fall within this limited definition.

At this time, it is unclear whether the provision of sewer services has been a function traditionally and exclusively exercised by government entities in Alabama. As stated above, Plaintiffs have made no such argument. The Defendants who have addressed this question have merely cited to a handful of relatively recent Alabama

cases wherein private sewer companies were parties. *E.g.*, *Gardens at Glenlakes Prop. Owners Assoc., Inc. v. Baldwin Cty. Sewer Serv., LLC*, 225 So. 3d 47 (Ala. 2016); *City of Millbrook v. Tri-Community Water Sys.*, 692 So. 2d 866 (Ala. Civ. App. 1997). Though suggestive of a private role in the provisions of sewer services, these relatively recent cases do not indicate just how long private companies have performed this function in Alabama.

Furthermore, the facts of these cases indicate that White Defendants performed a function essential to Lake View's health and growth. Lake View wanted a sewer system to serve its people. It therefore sought out White, courted him and his web of companies, and provided him with a "non-exclusive" franchise to construct a sewer system for the town. Through the contracts connecting Lake View, the GUSC, and White Defendants, the public entities provided favorable reimbursement terms for White Defendants, effectively making private collection losses into public losses. The GUSC then fell deeper and deeper into White's debt. To satisfy that debt, the GUSC contracted away even more rights and privileges, ultimately handing over the sewer system's operation to White Defendants, including the exclusive right to draft the system's policies without regard for ensuring due process for users. White Defendants remain the only sewer service

provider in Lake View.[7] These public entities have effectively allowed for the creation of a monopoly to provide sewer services to their residents, and in doing so, they have contracted away the obligation of anyone to ensure due process for those residents when disputes over billing and charges naturally arise. If these facts are not sufficient to show state action under the public function test, they at least provide further support that the public entities had so far insinuated themselves into a position of interdependence with White Defendants that they were joint participants in White Defendants' deprivation of Plaintiffs' constitutional rights.

Accordingly, Plaintiffs have demonstrated state action in these cases.

### b.  AVAILABILITY OF POST-DEPRIVATION REMEDIES

"[T]he constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990). "[A]t a minimum, the Due Process Clause requires notice and the opportunity to be heard incident to the deprivation of life, liberty or property at the hands of the government." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). Because of the "uniquely final

---

[7]     White has testified that Lake View is not dependent upon him for sewer services because "[t]hey could have gotten another provider." (Doc. 119-12 at 68 in Davis Case.) However, no record evidence suggests that Lake View has ever extended an invitation to another provider to create a competing sewer system to serve the town, much less an invitation with as favorable of terms as White Defendants have enjoyed.

deprivation" involved with losing essential utilities services—even for a short period of time—the U.S. Supreme Court has held that due process requires "notice reasonably calculated to apprise respondents of the availability of an administrative procedure to consider their complaint of erroneous billing," and "an opportunity to present their complaint to a designated employee empowered to review disputed bills and rectify error." *Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 20–22 (1978).

Defendants do not argue that Plaintiffs received sufficient due process prior to the alleged deprivations of their rights. Rather, they argue that no procedural due process violation has yet occurred because Plaintiffs may still pursue adequate post-deprivation remedies through common-law tort claims in state court.

Due process "is a flexible concept that varies with the particular situation." *Zinermon*, 494 U.S. at 127. The Supreme Court "usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Id.* "In some circumstances, however, the [Supreme] Court has held that a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process. *Id.* at 128. For example, post-deprivation remedies may be adequate in cases of negligent or intentional conduct by state employees. *See id.* at 128–30 (discussing *Parratt v. Taylor*, 451 U.S.

527 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986);

*Hudson v. Palmer*, 468 U.S. 517 (1984)). The Supreme Court has explained: "The

state can no more anticipate and control in advance the *random and unauthorized*

intentional conduct of its employees than it can anticipate similar negligent

conduct." *Id.* at 130 (quoting *Hudson*, 468 U.S. at 533) (emphasis added). Thus, a

threshold inquiry for whether post-deprivation remedies satisfy due process is

"whether the state is in a position to provide for predeprivation process." *Hudson*,

468 U.S. at 534.

The facts of these cases do not indicate that it was impracticable for the public

entities, particularly the GUSC, to provide due process prior to the alleged

deprivations of Plaintiffs' constitutional rights. In carrying out their collection

practices, the private entities did not do so negligently, nor did they engage in the

sort of "random and unauthorized intentional conduct" that would prove difficult

for the public entities to "anticipate and control." *Id.* at 533. The private entities

acted, in large part, pursuant to the Wastewater Standards. Though they did not

author the Wastewater Standards, the GUSC board unanimously adopted those

standards during a meeting on December 30, 2015, and they presumably knew that

the Wastewater Standards failed to include any provision for adequate pre-

deprivation due process. Furthermore, the GUSC, through board chairman Nancy

Ray, had notice of White's intentions to begin service cut-offs on properties with past due accounts. With its knowledge of White's intentions and the policies that White intended to follow, the GUSC was in a position to provide pre-deprivation safeguards for users such as Plaintiffs, but it failed to do so. Therefore, under these facts, the Court finds that pre-deprivation process was warranted in these cases, and Plaintiffs are not required to show the inadequacy of post-deprivation remedies.

Accordingly, Plaintiffs have met their burden of showing a lack of adequate process.

### c. LIABILITY OF LAKE VIEW AS A MUNICIPALITY

It is well accepted that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S 658, 691 (1978). "It is only when the execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (quoting *Springfield v. Kibbe*, 480 U.S. 257, 267 (1987) (O'Connor, J., dissenting)) (internal quotations removed).

To establish a municipality's liability under § 1983, "a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d

1283, 1289 (11th Cir. 2004) (citing *Canton*, 489 U.S. at 388). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). "A custom is a practice that is so settled and permanent that it takes on the force of law." *Id.*

Defendant Lake View argues that it is entitled to summary judgment on Plaintiffs' § 1983 claim because Lake View had no policy or custom that acted as a "moving force" behind Plaintiffs' injuries. *See Farred v. Hicks*, 915 F.2d 1530, 1532–33 (11th Cir. 1990) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). In their response, Plaintiffs rely upon three separate "policies" that they contend caused their injuries: (1) Lake View's agreement to fulfill certain reimbursement obligations under the 1999 purchase agreement with the GUSC; (2) Mayor Calhoun's letter to White, assuring White that Lake View police would be available if his agents encountered any resistance in the lawful performance of their duties; and (3) Lake View's alleged appointment of GUSC board members approved by White. Alternatively, Plaintiffs appear to argue that the policies of the GUSC should be treated as the policies of Lake View. Upon review, none of the polices on which Plaintiffs rely is sufficient to render Lake View liable under § 1983.

First, the link between Lake View's obligations under the 1999 purchase agreement with the GUSC and the deprivations that Plaintiffs suffered is tenuous at best. Under that agreement, Lake View promised to reimburse the GUSC for 90% of uncollectable past due accounts and "to use its best efforts and whatever means allowed by law to collect said past due accounts." (Doc. 119-12 at 140–41 in Davis Case.) Notably, these obligations are contingent upon the GUSC "exhaust[ing] all lawful means available to the [GUSC] to collect any accounts due." (*Id.* at 140.) Furthermore, the GUSC's role in collecting such accounts is itself contingent upon the private defendants' decision to designate such accounts uncollectable in the first place. Even read generously, Plaintiffs' arguments fail to demonstrate how Lake View's contingent obligations constituted a "moving force" behind their injuries.

Second, Mayor Calhoun's letter promising police protection is not a "policy" that directly led to the deprivation of Plaintiffs' rights. Mayor Calhoun's letter indicated that Lake View would "not tolerate harassment nor harm inflicted on any of [White's] crews attempting to carry out the lawful functions of their jobs," and it instructed White to have his agents "call 911 from a point of safety" if they encountered a problem. (Doc. 123-45 in Davis Case.) Plaintiffs argue that, as Lake View's mayor, Paul Calhoun had final policymaking authority and could bind Lake View through his letter to White. *See* Ala. Code § 11-43-81 (designating

municipality's mayor as "the chief executive officer," with "general supervision and control" of a municipality's affairs). However, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality). Plaintiffs have presented no evidence indicating that Mayor Calhoun was personally aware of what policies the private defendants would follow in collecting past due accounts from users such as Plaintiffs.[8] In the absence of such knowledge, the only policy that Mayor Calhoun's letter could represent is a general assurance of police protection to individuals who are harassed during the lawful performance of their duties. Furthermore, Plaintiffs have presented no evidence that Lake View officers played any part in the alleged deprivations of Plaintiffs' rights; White even testified that no police escort was present when his agents performed lock-outs on Plaintiffs' properties. (Doc. 119-12 at 62–63 in Davis Case.) Therefore, Plaintiffs have failed to show that Mayor Calhoun's letter promising police protection constituted a "moving force" behind their injuries.

---

[8]      Unlike Lake View councilwoman Nancy Ray, Mayor Calhoun did not sit on the GUSC board that unanimously adopted the Wastewater Standards. Plaintiffs do not argue that Nancy Ray, as a member of Lake View's town council, qualified as a final policymaker for the Town. Even if they did make such an argument, it is unlikely that she would qualify because Alabama law appears to vest final policymaking authority with the town council as a collective body. *See* Ala. Code § 11-43-43 ("All legislative powers and other powers granted to cities and towns shall be exercised by the council, except those powers conferred on some officers by law or ordinance.").

Third, Plaintiffs have failed to demonstrate that Lake View had a policy of appointing GUSC board members approved by White. The only evidence upon which Plaintiffs rely to prove such a policy is, presumably, the Second Forbearance Agreement, wherein the GUSC agreed "to obtain a resolution from the Town of Lake View to designate such individuals, subject to the approval of Lender, to serve as members of [the GUSC's] Board of Directors for those positions that may expire within Ninety (90) days from the date of this Agreement." (Doc. 113-11 at 9 in Davis Case.) However, Plaintiffs have pointed to no evidence indicating that Lake View itself ever adopted such a resolution, and GUSC board chairman Nancy Ray testified that the GUSC lacked authority to do anything more than "ask" that Lake View adopt such a resolution. (Doc. 113-9 at 66 in Davis Case.) Even if Lake View had adopted this policy, Plaintiffs still have not drawn a clear causal chain between Lake View's alleged appointment of certain White-approved GUSC board members and the injuries that Plaintiffs suffered. Accordingly, the Court finds that this alleged policy was not a "moving force" behind Plaintiffs' injuries.

Finally, the Court is not persuaded by Plaintiffs' argument that the policies of the GUSC should be treated as those of Lake View. "To prove municipal liability under § 1983, a plaintiff 'must show that the local government entity . . . has authority and responsibility over the governmental function at issue." *Teagan v. City*

*of McDonough*, 949 F.3d 670, 675 (11th Cir. 2020) (quoting *Grech v. Clayton Cty.*, 335 F.3d 1326, 1330 (11th Cir. 2003) (en banc)). The question of whether an official or entity acts on behalf of a municipality is "dependent on an analysis of state law" that goes beyond mere labels. *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 786 (1997). In determining whether Lake View possessed sufficient authority over the area in question, the Court "must 'respect state and local law's allocation of policymaking authority,' and not 'assume that final policymaking authority lies in some entity other than that in which state law places it.'" *Turquitt v. Jefferson Cty., Ala.*, 137 F.3d 1285, 1288 (11th Cir. 1998) (en banc) (quoting *McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996)), *cert denied*, 525 U.S. 874 (1998).

Alabama law appears to create a clear legal distinction between the GUSC and Lake View. "Municipalities are mere instrumentalities of the state possessing only such powers as may have been delegated to them by the legislature." *City of Leeds v. Town of Moody*, 319 So. 2d 242, 246 (Ala. 1975). Lake View authorized the incorporation of the GUSC pursuant to Ala. Code § 11-97-3. Within that same chapter of the Alabama Code, the GUSC is empowered to acquire and operate property for the provision of utility services, to enter into contracts, to lease or convey its property, to mortgage its property, and to adopt rules for the conduct of its affairs and business, among other powers. *See* Ala. Code §§ 11-97-1, *et seq.*

Plaintiffs argue that Lake View still retains some control because: (1) Lake View enjoys the exclusive right to appoint and elect GUSC board members, Ala. Code § 11-97-6(a); (2) Lake View must approve any amendments to the GUSC's Certificate of Incorporation, Ala. Code § 11-97-5; (3) Lake View would receive any net earnings from the GUSC, Ala. Code § 11-97-21; (4) Lake View would acquire the GUSC's assets in the event of the GUSC's dissolution, § 11-97-23; and (5) GUSC board members are subject to removal and impeachment proceedings like other municipal officers, Ala. Code § 11-97-6(d). However, none of these limited powers identified by Plaintiffs indicates that Lake View had the power to prescribe the procedures to be used by the GUSC in operating the local sewer system. Furthermore, the Alabama Supreme Court has recently held that a public utilities corporation created under a similar authorizing statute was "entirely independent and separate from" its related municipality. *Water Works Bd. of City of Arab v. City of Arab*, 231 So. 3d 265, 269, 273 (Ala. 2016) (analyzing a "statutorily created independent corporation tasked with operating the waterworks system" pursuant to Ala. Code § 11-50-234). Therefore, the Court finds that, under Alabama law, the GUSC is an independent public corporation, the policies of which cannot be attributed to Lake View.

Accordingly, Plaintiffs have failed to demonstrate that a policy or custom of Lake View was a "moving force" behind their constitutional injuries. Summary judgment is therefore due to be granted for Lake View as to Plaintiffs' § 1983 violation claim.

### d. LIABILITY OF EOS DEFENDANTS

In their consolidated motions for summary judgment, Defendants Walraven and EOS assert that Plaintiffs have failed to show that EOS Defendants deprived them of any constitutionally protected liberty or property interest. Therefore, they argue that they are entitled to summary judgment as to Count One of Slone Plaintiffs' and Lawrence Plaintiffs' amended complaints ("Slone/Lawrence Complaint"). (Doc. 48 in Slone Case; Doc. 44 in Lawrence Case.)

The Slone/Lawrence Complaint includes very few specific allegations regarding the conduct of EOS Defendants. Indeed, the only specific allegation as to their conduct indicates that "Walraven . . . illegitimately filed an Alabama Uniform Incident/Offense Report for Theft of Services First Degree (Greater than $2,500), pursuant to Ala. Code §13A-8-10.1, against Nicole Slone for an allegedly broken water valve and the alleged removal of a padlock." (Doc. 48 at ¶ 47 in Slone Case).[9]

---

[9]     Plaintiffs include a nearly identical allegation regarding Walraven's filing of a police report against Mr. Lawrence. (Doc. 44 at ¶ 47 in Lawrence Case.)

Furthermore, Count One of the Slone/Lawrence Complaint does not refer to either of EOS Defendants by name. It does, however, reference EOS Defendants' alleged act of "filing an unlawful criminal complaint." (Doc. 48 at ¶ 91 in Slone Case; Doc. 44 at ¶ 81 in Lawrence Case.)

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Therefore, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* Here, Plaintiffs have not specified which constitutional right EOS Defendants allegedly violated through their actions. Given that Plaintiffs' sole allegation against EOS Defendants in Count One is based on the filing of a police report, their § 1983 violation appears analogous to a claim for either false arrest or malicious prosecution in violation of the Fourth Amendment. However, "[a] claim of false arrest or imprisonment under the Fourth Amendment concerns *seizures* without legal process, such as warrantless arrests." *Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. July 13, 2020) (emphasis added). Further a claim for malicious prosecution "requires a *seizure* 'pursuant to legal process.'" *Id.* (emphasis added) (quoting *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016)). The record indicates that EOS Defendants' filing of police reports, even if wrongful, did not

result in the detainment, arrest, or prosecution of Plaintiffs. As a result, Plaintiffs have failed to show that EOS Defendants' actions constituted a "seizure" sufficient to deprive them of their liberty or property interests.[10]

Accordingly, summary judgment is due to be granted for EOS Defendants as to Count One of the Slone/Lawrence Complaint.

## 2. COUNT TWO – CONSPIRACY TO COMMIT § 1983 VIOLATION

Plaintiffs have also brought § 1983 conspiracy claims against White Defendants, Lake View, and the GUSC.[11] "A plaintiff may state a § 1983 claim for conspiracy to violate constitutional rights by showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010). To prevail on such a claim, Plaintiffs "must allege that (1) the defendants reached an understanding or agreement that they would deny the plaintiff one of [their] constitutional rights; and (2) the conspiracy resulted in an actual denial of one of [their] constitutional rights." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1327 (11th Cir. 2015).

---

[10]    For this same reason, the Court is skeptical as to whether Plaintiffs will be able to demonstrate that White Defendants' threats of arrest constituted a deprivation of their property or liberty interests. However, it is not implausible at this time that Plaintiffs could prove that the threats of arrest bolstered other means through which White Defendants allegedly deprived Plaintiffs of their property or liberty interests.

[11]    Based on this Court's reading of Plaintiffs' complaints, as well as Plaintiffs' consolidated response to summary judgment, it does not appear that they have asserted any § 1983 conspiracy claims against EOS Defendants.

### a. AGREEMENT

Defendants argue that Plaintiffs have failed to show any sort of agreement to violate Plaintiffs' rights. "[T]he linchpin for conspiracy is agreement, which presupposes communication." *Bailey v. Bd. of Cty. Comm'rs of Alachua Cty., Fla.*, 956 F.2d 1112, 1122 (11th Cir. 1992). Plaintiffs need not "produce a 'smoking gun' to establish the 'understanding' or 'willful participation' required to show a conspiracy, but must show some evidence of agreement between the defendants." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283–84 (11th Cir. 2002) (quoting *Bendiburg v. Dempsey*, 909 F.2d 463, 469 (11th Cir. 1990)) (internal citation omitted).

The Court disagrees with Defendants' contention that Plaintiffs have offered no evidence of an agreement between the public and private defendants. Based on the communications between White and GUSC chairman Nancy Ray shortly before White Defendants commenced service cut-offs, the Court finds that Plaintiffs have created a genuine dispute as to whether the public and private defendants reached an understanding to violate Plaintiffs' rights. Accordingly, to the extent that Defendants' motions are based on a lack of agreement between the public and private defendants, summary judgment is due to be denied.

### b. POLICY OR CUSTOM OF LAKE VIEW

The Eleventh Circuit has held that "a [§ 1983] conspiracy claim against a municipality must include the existence of a policy or custom underlying the conspiracy." *Weiland*, 792 F.3d at 1330. Defendant Lake View argues that there is insufficient evidence to find that it had a policy or custom that injured Plaintiffs. In response, Plaintiffs again rely on the conduct and decisions by Lake View already discussed in this Court's analysis of Count One. For the same reasons that Lake View's actions do not constitute a policy or custom to violate Plaintiffs' procedural due process rights, Plaintiffs have failed to create a genuine dispute as to their § 1983 conspiracy claim against Lake View. Accordingly, summary judgment is due to be granted for Lake View as to this claim.

### B. FDCPA CLAIMS

Plaintiffs have brought claims against White Defendants for a violation of the Fair Debt Collection Practices Act. 15 U.S.C. § 1692, *et seq*. However, in their consolidated response, Plaintiffs have conceded that summary judgment is due to be granted for White Defendants as to this claim. Accordingly, the Court will do so.

### C. TRESPASS CLAIMS

Plaintiffs bring state-law trespass claims against White Defendants and EOS Defendants, asserting that Walraven, while acting as an agent for White Defendants,

intentionally entered Plaintiffs' properties to install service cut-offs. "One is subject to liability to another for trespass . . . if he intentionally . . . [e]nters land in the possession of the other, [o]r causes a thing or a third person [t]o do so, or . . . remains on the land, or . . . fails to remove from the land a thing which he is under a duty to remove." *Rushing v. Hooper-McDonald, Inc.*, 300 So. 2d 94, 96 (Ala. 1974) (quoting *Restatement (Second) of Torts*, § 158).

Defendants do not dispute that Defendant Walraven, on direction from White Defendants, entered the properties of Plaintiffs to install service cut-offs. Rather, they argue that no trespass occurred because Plaintiffs consented to Walraven's entry through their acceptance of their USAs. Under each of the USAs pertinent to Plaintiffs' properties, in the event of a user's default in payment or violation of the Wastewater Standards, "[the] Utility may . . . after ten (10) days written notice delivered to the Property . . . cause the supply of water to the Property to be stopped or restricted or may itself shut off or restrict such supply and, for that purpose, may enter upon the Property . . . ." (Doc. 33-4 at 31 in Davis Case.)[12] Additionally, the Wastewater Standards provide a right of entry on any connected property for any agent of the sewer system "upon presentation of his/her credentials to any

---

[12]    Nearly identical provisions are found in the USAs pertinent to the Slone and Lawrence properties. (*See* doc. 119-5 at 57 in Davis Case; doc. 44-3 at 4 in Lawrence Case.)

User . . . within thirty (30) minutes of such presentation." (Doc. 113-12 at 84 in Davis Case.)[13]

"If a party enters property or possesses property under a legal right, entry or possession pursuant to that right cannot constitute a trespass." *Boyce v. Cassese*, 941 So. 2d 932, 945 (Ala. 2006). Consent to entry from the property owner is a defense against a trespass claim. *McCaig v. Talladega Pub. Co., Inc.*, 544 So. 2d 875, 879 (Ala. 1989).

Plaintiffs argue that they are not bound by the applicable USAs or the Wastewater Standards because they never executed any such agreements upon taking possession of their homes. Notably, the Alabama Supreme Court has previously held that property owners may consent to a utility company's policies through acceptance of the utility company's services, as Plaintiffs did in these cases. *Id.* (holding that property owners accepted utility cooperative's policies, including its right of entry to inspect equipment, when they accepted the services of the utility cooperative). Regardless, Defendants cannot defeat Plaintiffs' trespass claims merely by relying on their right of entry under the USAs and Wastewater Standards.

---

[13]    The record does not indicate whether both notice requirements must be satisfied before entry onto Plaintiffs' property is permitted. However, the requirements do not appear to contradict one another, and Defendants could reasonably meet both before entering the properties. Because the Court must read the facts in the light most favorable to Plaintiffs, it assumes that both requirements must be satisfied.

Even if the Court accepts that the USAs and Wastewater Standards are enforceable here, Defendants have failed to show that they followed those policies when entering Plaintiffs' properties. As stated above, each of the USAs only permits a right of entry for White Defendants and their agents after ten days' written notice of a default or violation. Defendants have pointed to no record evidence that either Davis Plaintiffs or Lawrence Plaintiffs received such written notice within the required time prior to Walraven's entry.[14] This failure alone warrants permitting the trespass claims of Davis Plaintiffs and Lawrence Plaintiffs to proceed to trial. Furthermore, Defendants have presented no evidence that Walraven presented his credentials to any plaintiff at least thirty minutes prior to his entry onto their properties, as required under the Wastewater Standards. Thus, a genuine dispute exists as to whether any of Plaintiffs, including Slone Plaintiffs, consented to Walraven's entry onto their property.

Because White Defendants and EOS Defendants cannot show that they satisfied all notice requirements upon which their right of entry was contingent, their summary judgment motions are due to be denied as to Plaintiffs' trespass claims.

---

[14]     As previously noted, the record does indicate that Slone Plaintiffs received written notice of scheduled cut-offs.

### D. PRIVATE NUISANCE CLAIMS

Plaintiffs also bring state-law claims for private nuisance against White Defendants and EOS Defendants. Specifically, they allege that (1) these defendants entered Plaintiffs' properties and installed service cut-offs, and (2) these defendants assessed fees that ran with Plaintiffs' properties. Based on these actions, Plaintiffs allege that the value of their homes fell, and they faced a deprivation of the full use and enjoyment of their properties.

Alabama law defines a nuisance as "anything that works hurt, inconvenience, or damage to another" and states that "[t]he inconvenience complained of . . . should be such as would affect an ordinary reasonable man." Ala. Code § 6-5-120. "The essence of private nuisance is an interference with the use and enjoyment of land . . . ." *Crouch v. N. Ala. Sand & Gravel, LLC*, 177 So. 3d 200, 209 (Ala. 2015) (quoting *Morgan Concrete Co. v. Tanner*, 374 So. 2d 1344, 1346 (Ala. 1979)). "[V]irtually any disturbance to the enjoyment of property may amount to a nuisance," provided that the interference "is substantial and unreasonable, and such as would be offensive or inconvenient to the normal person." *Id.* (quoting *Morgan Concrete*, 374 So. 2d at 1346).

The Alabama Supreme Court has held that "there can be no abatable nuisance for doing in a proper manner what is authorized by law." *Johnson v. Bryant*, 350 So.

2d 433, 436 (Ala. 1977) (quoting *Fricke v. City of Guntersville*, 36 So. 2d 321, 322 (Ala. 1948)). Defendants contend that each of the offensive acts on which Plaintiffs rely was authorized under either Plaintiffs' USAs or the Wastewater Standards. Therefore, they argue that there can be no private nuisance as a matter of law. Notably, White Defendants and EOS Defendants offer no other argument as to why Plaintiffs have failed to show a private nuisance.

Plaintiffs' private nuisance claims appear to be based, at least in part, on allegations that White Defendants and EOS Defendants trespassed onto Plaintiffs' properties. As discussed above, a genuine dispute exists as to whether these defendants entered Plaintiffs' properties improperly and without permission. By extension, a genuine dispute must also exist as to whether the alleged entry onto Plaintiffs' property constituted a private nuisance.

Accordingly, White Defendants' and EOS' motions for summary judgment are due to be denied as to these claims.

### E.  State-Law Deprivation of Property Rights Claims

Plaintiffs each purport to bring a claim for deprivation of property rights under Alabama law against White Defendants, Lake View, and the GUSC.[15] Plaintiffs allege

---

[15]    Lake View represents that Plaintiffs have conceded that their state-law deprivation of property rights claims against Lake View are barred by Ala. Code § 11-97-190. (Doc. 117 at 80 n.10 in Davis Case). Although the Court has not found this concession in the record, it nevertheless takes Lake View at its word. Accordingly, the Court dismisses Plaintiffs' state-law deprivation of

that White Defendants "impaired Plaintiffs' right of access to its real property water main line and Plaintiffs continue to live under the threat of such impairment based on a monthly inflating disputed sewer service liability." (Doc. 33 at ¶ 111 in Davis Case).[16] They further allege that Lake View and the GUSC permitted White Defendants to write the policies from which the deprivations resulted. (*Id.* at ¶ 112.)

Although authority on this cause of action appears scarce, the Court is aware of at least one Alabama case that references a claim for "deprivation of property rights" as a standalone claim. *See Willow Lake Residential Ass'n, Inc. v. Juliano*, 80 So. 3d 226 (Ala. Civ. App. 2010). In *Willow Lake*, a plaintiff brought a "deprivation of property rights" claim, alleging that a homeowners' association had denied him access to steps he had constructed to access a lake behind his home. *Id.* at 247–48. Although the trial court awarded him damages on this claim, the Alabama Court of Appeals reversed. *Id.* at 248. The Court of Appeals explained that "[b]ecause [the plaintiff] had no right to build steps for his use on the common area, he cannot claim any deprivation of that right." *Id.* Although the Court of Appeals did not discuss a "deprivation of property rights" claim in detail, it did assume that such a claim

---

property rights claims against Lake View. If the Court's reading is in error, Plaintiffs shall notify the Court in writing by no later than ten (10) days from the date of this Opinion and Order.

[16]    These allegations are common throughout each amended complaint in these cases. (*See* doc. 48 in Slone Case; doc. 44 in Lawrence Case.)

existed. Accordingly, the Court finds that there are sufficient grounds to conclude that such a claim exists under Alabama law.

Defendants argue that Plaintiffs cannot show that their property rights were violated because White Defendants acted pursuant to the Wastewater Standards. In other words, Defendants appear to argue that Plaintiffs lacked property rights insofar as those rights conflicted with the Wastewater Standards. *Cf. Willow Lake*, 80 So. 3d at 248 (holding that no deprivation of property rights occurred where the plaintiff failed to prove he had any right to build on the property). To be sure, the Wastewater Standards allow for suspension of services and the assessment of penalties in the event of default or a violation. However, the record does not provide sufficient evidence that White Defendants acted wholly in accordance with those rules. For example, as discussed above, there is a genuine dispute as to whether an agent of White Defendants trespassed on Plaintiffs' properties when suspending their services. Furthermore, the first major penalties assessed against Plaintiffs—for their tampering with the service-cutoff locks placed on their properties—involve locks that were placed when White Defendants' agent arguably committed trespass. The Court is not satisfied from the record that White Defendants had the right to assess penalties for tampered locks that appear to have been improperly placed on Plaintiffs' properties. The Court therefore finds that a genuine dispute exists as to

whether Defendants' actions violated Plaintiffs' property rights under Alabama law.[17]

Accordingly, Defendants' motions for summary judgment are due to be denied as to these claims.

## F. UNJUST ENRICHMENT CLAIMS

Plaintiffs also bring unjust enrichment claims against White Defendants. Specifically, they assert that White Defendants have placed liens on Plaintiffs' properties and are holding said liens as leverage to coerce Plaintiffs to pay the fees assessed against them.

"To prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation." *Portofino Seaport Village, LLC v. Welch*, 4 So. 3d 1095, 1098 (Ala. 2008). For the purposes of an unjust enrichment claim, a "benefit" may arise "[w]henever one person adds to the other's advantage in any form, whether by increasing his holdings

---

[17]     That the GUSC did not make the specific decisions regarding Plaintiffs' properties is insufficient to warrant summary judgment for that defendant. Plaintiffs have alleged that the GUSC permitted White Defendants to craft the Wastewater Standards, policies which arguably provided cover for White Defendants to commit their alleged deprivations of Plaintiffs' property rights.

or saving him from expense or loss." *Jewett v. Boihem*, 23 So. 3d 658, 661 (Ala. 2009)

(quoting *Opelika Prod. Credit Ass'n v. Lamb*, 361 So. 2d 95, 99 (Ala. 1978)).

Upon review of the record, Plaintiffs' unjust enrichment claims must fail because they have not shown how they provided any sort of benefit to White Defendants. The record indicates that, after Plaintiffs failed to pay their sewer fees and assessments, White Defendants filed liens on their properties. Plaintiffs appear to argue that the filing of these liens constituted a benefit for White Defendants. However, Plaintiffs have cited no authority indicating that Alabama law recognizes an unjust enrichment claim based on the holding of a disputed debt. Worse still, Plaintiffs themselves argue that White Defendants are "holding a disputed debt obligation against . . . the Plaintiffs' property and the equity therein to coerce the Plaintiffs to pay the full balance of the disputed sewer service debts." (Doc. 123 at 99 in Davis Case.) Thus, they have effectively conceded that each lien filed by White Defendants serves merely as a *means to obtain a benefit*, rather than a benefit in and of itself. Accordingly, summary judgment is due to be granted for White Defendants as to these claims.

### G. Outrage Claims

Plaintiffs also bring claims against White Defendants under Alabama's tort of outrage. Under Alabama law, the tort of outrage is effectively a claim for intentional

infliction of emotional distress. *Wilson v. Univ. of Ala. Health Servs. Found., P.C.*, 266 So. 3d 674, 675 n.1 (Ala. 2017). To recover under the tort of outrage, Plaintiffs "must demonstrate that [White Defendants'] conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Id.* at 676.

"The tort of outrage is an extremely limited cause of action." *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000). Generally, the Alabama Supreme Court "has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual harassment." *Id.* (internal citations omitted). The Alabama Supreme Court has noted that the tort of outrage is not strictly limited to the above examples. *Little v. Robinson*, 72 So. 3d 1168, 1172–73 (Ala. 2011). However, that court has cautioned that "[i]t is clear . . . that the tort of outrage is viable only when the conduct is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* (quoting *Horne v. TGM Assocs., L.P.*, 56 So. 3d 615, 631 (Ala. 2010)) (internal quotations omitted). White Defendants argue that their actions do not rise to the level of outrage necessary for Plaintiffs' claims to prevail. This Court disagrees.

The record indicates that White Defendants have assessed abnormally high sewer fees and penalties against Plaintiffs that collectively total $277,389.01 for approximately three years of sewer services on three residential properties. To illustrate just how substantially Plaintiffs' debts have ballooned in such a short period of time, the Court need only reiterate the situation of Lawrence Plaintiffs: in July 2017, they had an outstanding sewer account balance of $327.00, and as of March 2020, they had an outstanding balance of $119,287.13. To reach such a figure, White Defendants have relied upon two primary practices: (1) there is no method or procedure for sewer users to challenge the fees assessed against them, and (2) they do not permit partial payments by users such as Plaintiffs. Based on the first policy, they are able to assess large fees, such as the $5,000.00 lock tampering penalty assessed against each of Plaintiffs' properties, without any means for users to disprove or challenge assessments against them.[18] Thus, a user's debt can increase substantially in a short window of time. This issue is compounded by White Defendants' refusal to accept partial payments, which may prevent less affluent users from mitigating their debt and force them to watch as the interest on that debt

---

[18]     Although Mrs. Lawrence appears to have acknowledged removing the water shut-off lock on her property, Lawrence Plaintiffs may still have benefited from an opportunity to be heard. As discussed above, a genuine issue exists as to whether Walraven improperly entered Lawrence Plaintiffs' property to install that lock. It is not clear from the record whether the tampering fee would have applied even if the lock had been improperly placed.

continues to accrue. Eventually, the option of making the account current through one large payment begins to disappear altogether.

Based on the volume of debt assessed, alone, this Court would likely find that Plaintiffs have created a jury question as to their outrage claims. Plaintiffs' claims are further bolstered by the various threats that White Defendants have made against them in seeking to collect the assessed fees. Specifically, Plaintiffs have alleged that White Defendants threatened to cut off their water supply[19] and to have them prosecuted under an Alabama law that White knew did not apply. [20] To be sure, Alabama's tort of outrage "does not recognize recovery for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Little*, 72 So. 3d at 1172 (quoting *Am. Road Serv. Co. v. Inmon*, 394 So. 2d 361, 364–65 (Ala. 1980) (internal quotation marks removed)). Yet White Defendants made these threats in connection with enormous debts that Plaintiffs had little chance of being able to pay. In that

---

[19]     It is not at all clear how White Defendants had any authority from the provider of water to Plaintiffs' residences to cut off the supply of water in this way.

[20]     The collection letters that Plaintiffs received following the suspension of their services each threatened "criminal prosecution under Code of Alabama §13A-8-10 and §13A-8-23." (*See e.g.*, Doc 33-3 at 9 in Davis Case.) The two code sections criminalize the theft of services and tampering with the availability of gas, electricity, or water, respectively. Neither code section specifically mentions any protections for sewer services. Ala. Code §§ 13A-8-10; 13A-8-23. Plaintiffs have presented record evidence that, as late as March 6, 2017, White attempted to lobby for an amendment to these sections that would "make the theft of sewer services against the law in Alabama, and give the same protection for a sewer utility as now given water, gas, and electrical services." (Doc. 123-38 at 2 in Davis Case.)

context, threats of malicious prosecution or the termination of a service on which Plaintiffs depend to live provide further proof that White Defendants acted in an outrageous manner.

White Defendants argue that their conduct cannot be outrageous as a matter of law because it was permissible under the USAs and Wastewater Standards. In support, they cite to a number of cases supporting the general proposition that "insisting upon [one's] legal rights in a permissible way" is not grounds for an outrage claim. *Gibson v. S. Guar. Ins. Co.*, 623 So. 2d 1065, 1067 (Ala. 1993). That proposition is true, insofar as it is difficult to show that action taken pursuant to legal right amounts to outrageous conduct. Yet that principle cannot carry the day in all cases, particularly where it would leave an average citizen vulnerable to endless deprivations by those who possess all bargaining power. Furthermore, White Defendants have failed to satisfy the Court that they acted pursuant to their legal rights "in a permissible way." *Id.* Not only did White make threats of criminal prosecution under a law that he understood was inapplicable, but the first major catalyst for the excessive fees assessed against Plaintiffs—that they allegedly removed the service cut-off locks—occurred only after White Defendants arguably caused a trespass onto Plaintiffs' properties. As a result, White Defendants cannot

escape Plaintiffs' outrage claims merely by citing their rights under the USAs and Wastewater Standards.

The facts, read in the light most favorable to Plaintiffs, present a situation wherein a private utility provider acquired power from a public entity and then systematically used that power to exploit and harass some of its much weaker customer base. On this record, Plaintiffs have more than presented enough evidence to justify allowing their outrage claims to proceed to a jury.

Accordingly, White Defendants' motions for summary judgment are due to be denied as to these claims.

## H. FRAUD CLAIMS

Slone Plaintiffs have brought three fraud-related claims against White Defendants: (1) fraudulent misrepresentation, (2) fraudulent suppression, and (3) civil conspiracy to commit fraud. (Doc. 48 in Slone Case.) Each of these claims arises from Ms. Snow's representations that Slone Plaintiffs could have their sewer service temporarily suspended during the time they left Alabama to seek work in Kentucky.

A claim of fraud generally requires proof of "(1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation." *Padgett v. Hughes*,

535 So. 2d 140, 142 (Ala. 1988). A claim for fraudulent suppression requires proof of "(1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; [and] (4) action by the plaintiff to his or her injury." *Lambert v. Mail Handlers Ben. Plan*, 682 So. 2d 61, 63 (Ala. 1996). Thus, for each of Slone Plaintiffs' fraud-related claims to prevail, Slone Plaintiffs must show both a material misrepresentation on the part of White Defendants and detrimental reliance on their own part.[21]

Reading the facts in the light most favorable to Slone Plaintiffs, they have failed to demonstrate that they relied upon Ms. Snow's representations to their detriment. "Reliance requires that the misrepresentation actually induced the injured party to change its course of action." *Hunt Petroleum Corp. v. State*, 901 So. 2d 1, 4 (Ala. 2004). As noted above, Slone Plaintiffs each conceded in their depositions that they had no choice but to move to Kentucky for Mr. Slone to find employment. In their sur-reply brief, Slone Plaintiffs now argue that, but for Ms.

---

[21]    White Defendants have made no argument regarding Slone Plaintiffs' claim for conspiracy to commit fraud. Therefore, if either of the other fraud-related claims survives summary judgment, the conspiracy claim would also survive. Conversely, if Plaintiffs have failed to show any underlying fraud, their fraud conspiracy claim must also fail. *See Goolesby v. Koch Farms, LLC*, 955 So. 2d 422, 430 (Ala. 2006) ("A civil conspiracy cannot exist in the absence of an underlying tort.").

Snow's representations, they "could have kept their sewer bills current, especially had they known of the exorbitant and unconscionable penalties that would result." (Doc. 171 at 9 in Slone Case.) However, they have not cited to any record evidence supporting the proposition that they would otherwise have paid their bills during the time that they were in Kentucky. Indeed, as noted above, Mrs. Slone testified that she and her husband could not afford to pay their sewer bills every month during that period. Accordingly, Slone Plaintiffs have failed to show detrimental reliance necessary for any of their fraud claims to proceed, and summary judgment is due to be granted for White Defendants as to these claims.

## I.   UNLAWFUL DECEPTIVE TRADE PRACTICES VIOLATION CLAIMS

Finally, Plaintiffs have also brought a claim for unlawful deceptive trade practices violations under Alabama law against White Defendants. However, as with their FDCPA claim, Plaintiffs have conceded that summary judgment is due to be granted for White Defendants as to this claim. Accordingly, the Court will do so.

## IV.   CONCLUSION

For the foregoing reasons, Lake View's motions are due to be granted, the GUSC's motions are due to be denied, and the other Defendants' motions are due to be granted in part and denied in part. An order consistent with this Opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on August 14, 2020.

L. Scott Coogler
United States District Judge

199455